R. SHANE JOHNSON, (Utah Bar No. 14217)
shane@utahdefense.com
24 D Street
Salt Lake City, UT 84103
801-656-8061

*Attorney for Plaintiffs*

---

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TAMERA R. BILLS, individually, and as putative class representative for JOHN and JANE DOE PLAINTIFFS 1 – 5,000 (identities unknown), <br><br> *Plaintiffs*, <br><br> -*v*- <br><br> SIMARJIT GILL, in his individual capacity and official capacity as Salt Lake County District Attorney; JEFFREY HALL, in his individual capacity and official capacity as Salt Lake County Chief Deputy District Attorney; and SALT LAKE COUNTY, in its official capacity as a subdivision of the State of Utah; and JOHN and JANE DOE DEFENDANTS 1 – 100 (identities unknown), <br><br> *Defendants*. | **CLASS ACTION COMPLAINT** <br><br> Civil № 2:25:cv-00351 <br><br> Judge_____ |

Plaintiff Tamera R. Bills ("Ms. Bills"), individually – and as putative representative of a similarly situated class of plaintiffs whose identities are currently unknown – complains under §§ 1983 and 1988 against: Defendants Simarjit Gill ("DA Gill"), individually and in his official capacity as Salt Lake County District Attorney; Jeff Hall ("CDDA Hall"), individually and in his official capacity as Salt Lake County Chief Deputy District Attorney, and Salt Lake County, a political subdivision of the State of Utah. Ms. Bills Complains as follows:

1

**INTRODUCTION**
**(Class Action Complaint – Civil Rights (42 U.S.C. § 1983) – Jury Trial Demanded)**

**Nature of Action:** This is a civil rights class action brought under 42 U.S.C. § 1983 to remedy and halt an unlawful and unconstitutional scheme orchestrated by the Salt Lake County District Attorney's Office and implemented for seven years or longer. Defendants have **issued fraudulent District Attorney Subpoenas ("DA Subpoenas") under color of law** – documents not authorized by any rule, law, or court – to coerce individuals, including Plaintiff **Tamera Bills**, to appear at the **District Attorney's Office** ("DA's Office") under threat of contempt. Upon appearing, these individuals have been **searched, detained in a secure area, behind armed Sheriff's deputies, and not free to leave** for a period of time, all **without a warrant, court order, or lawful justification**. *Witnesses* subject to the DA Subpoenas are then commanded to travel to a nearby courthouse for scheduled hearings, again herded through security checkpoints and detained under the authority of *ultra vires* commands until released by a court. This complaint seeks to hold Defendants accountable for violating the **Fourth Amendment right to be free from unreasonable searches and seizures** and the **Fourteenth Amendment right to substantive due process**, and to obtain declaratory and injunctive relief to stop this practice on a class-wide basis, as well as damages for those harmed which, upon information and belief, number in the thousands.

**Class Action Allegations:** Plaintiff Bills brings this action on behalf of a class of all individuals similarly situated who have been or will be subjected to Defendants' practice of using unlawful "DA Subpoenas" to compel attendance and detain witnesses. The class seeks **declaratory and injunctive relief under Fed. R. Civ. P. 23(b)(2)** to end this ongoing policy, which applies generally to the class. Plaintiff also seeks appropriate compensatory damages for

2

herself and class members who were previously harmed, and **punitive damages** against the individual Defendants for their knowing, willful violation of clearly established constitutional rights.

**Defendants:** The Defendants are **Sim Gill ("DA Gill")**, the Salt Lake County District Attorney, and **Jeff Hall ("CDDA Hall")**, Chief Deputy District Attorney – both sued in their **individual capacities** (for personal liability) and **official capacities** (for injunctive and declaratory relief and as representatives of the county). **Salt Lake County** is also named as a Defendant as the governmental entity responsible for the policies of the District Attorney's Office. DA Gill, as the elected District Attorney, and CDDA Hall, as DA Gill's Chief Deputy District Attorney over the office's criminal division, are final policymakers for Salt Lake County, and their actions described herein reflect official policy or custom, rendering **Salt Lake County liable under *Monell v. Dept. of Social Services*** for the constitutional violations. Their actions and directions vis-à-vis this official policy were carried out with acquiescence by other prosecutors (Defendants John and Jane Does 1-100), whom DA Gill and CDDA Hall (officially) failed to train, supervise, or stop these ongoing unlawful and unconstitutional practices despite notice of their illegality as early as 2018.

**Summary of Claims:** In sum, Plaintiff alleges that **Defendants' use of *ultra vires* subpoenas to detain witnesses** in a closed setting at the DA's Office, **where their personal belongings** were searched by Sheriff's deputies at a security checkpoint, and then again when **they were involuntarily and unlawfully herded into the courthouse and searched by Sheriff's deputies again to be detained again until released by the Court**, constitutes an unlawful **search and seizure** in violation of the Fourth Amendment, and an abuse of government

power that **shocks the conscience** in violation of the Fourteenth Amendment's substantive due process guarantee.

This conduct was clearly unconstitutional under existing law (including federal court precedent interpreting analogous Rule 17 of the Federal Rules of Criminal Procedure), and Defendants **DA Gill and CDDA Hall had actual notice** of its illegality from prior judicial rulings and complaints by attorneys. Nonetheless, Defendants persisted in the scheme, acting in knowing or reckless disregard of individuals' rights. Ms. Bills, on behalf of herself and the class, seeks a **declaratory judgment** that the scheme is unconstitutional, a **permanent injunction** stopping Defendants from issuing such "DA Subpoenas" and detaining and searching recipients pursuant to them, and an award of **compensatory damages** (to redress the harm to those who were unlawfully searched and seized) and **punitive damages** against the individual Defendants (to punish and deter their wrongful conduct). Plaintiff also seeks reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and any other available relief.

## JURISDICTION AND VENUE

1. **Jurisdiction:** This Court has subject matter jurisdiction under **28 U.S.C. § 1331** and **28 U.S.C. § 1343(a)** because this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments. Jurisdiction for declaratory relief is also authorized by **28 U.S.C. §§ 2201–2202** (Declaratory Judgment Act).

2. **Venue:** Venue is proper in this District under **28 U.S.C. § 1391(b)** because **all Defendants are located in this District and the acts and omissions giving rise to the claims occurred in Salt Lake County, Utah**, which is within the District of Utah.

## PARTIES

3. **Plaintiff Tamera Bills:** Plaintiff **Tamera Bills** is an individual residing in Salt Lake County, Utah. She is a law-abiding citizen who was subjected to the unlawful subpoena and detention and search practices described below. Ms. Bills is the proposed class representative for the class of individuals impacted by Defendants' conduct. Her claims are typical of the class, and she will fairly and adequately protect the interests of the class.

4. **Plaintiffs John and Jane Does 1-5,000**: The putative class members are similarly situated individuals who were subjected to the Salt Lake County District Attorney's practice of issuing subpoenas that commanded appearance at the District Attorney's Office rather than before a court, magistrate, grand jury, or other proper authority, in violation of Utah R. Crim. P. 14, Utah R. Civ. P. 4 and 45, Utah Code § 77-22-2, and the Fourth and Fourteenth Amendments. The true names and capacities of these individuals are unknown at this time but will be identified through discovery. Plaintiff Ms. Bills brings this action on behalf of herself and all others similarly situated.

5. **Defendant Sim Gill:** Defendant **Sim Gill** is the Salt Lake County District Attorney, an elected official responsible for prosecuting criminal cases in Salt Lake County. He is sued in his **individual capacity** for damages and in his **official capacity** for declaratory and injunctive relief. At all relevant times, DA Gill was acting under color of state law in formulating, authorizing, or acquiescing in the policies and practices of the Salt Lake County District Attorney's Office, including the issuance of investigative subpoenas and treatment of witnesses as alleged herein. As District Attorney, Gill was a **final policymaker for Salt Lake County** in the area of prosecutorial investigations and thus his actions and directives represent official policy of Salt Lake County, making the County liable for those actions under *Monell*.

6. **Defendant Jeff Hall:** Defendant **Jeff Hall** is the Chief Deputy District Attorney in the Salt Lake County District Attorney's Office, responsible for leading the office's criminal prosecution division. He is sued in his **individual capacity** for damages and in his **official capacity** for declaratory and injunctive relief. At all relevant times, Defendant Hall was acting under color of state law in formulating, authorizing, or acquiescing in the policies and practices of the Salt Lake County District Attorney's Office, including the issuance of investigative subpoenas and treatment of witnesses as alleged herein. As Chief Deputy District Attorney, Hall was a **final policymaker for Salt Lake County** in the area of prosecutorial investigations and thus his actions and directives represent official policy of Salt Lake County, making the County liable for those actions under *Monell*.

7. **Defendant Salt Lake County:** Defendant **Salt Lake County** is a county government and a municipal entity organized under the laws of the State of Utah. The Salt Lake County District Attorney's Office is a department or agency of Salt Lake County (or alternatively, Salt Lake County is statutorily obligated to fund and administer the District Attorney's Office). At all relevant times, DA Gill and other prosecutors in his office acted as officials of Salt Lake County, and their acts represent the policy, practice, or custom of Salt Lake County. Salt Lake County is sued under **42 U.S.C. § 1983** for injunctive and declaratory relief and for damages in connection with the constitutional violations committed pursuant to its official policies or customs. **Salt Lake County is liable under the *Monell* doctrine** because the unlawful actions described were taken pursuant to **official policy or widespread custom** of the County (through the District Attorney's Office), and/or by officials with final policymaking authority (DA Gill and CDDA Hall), and the County and its policymakers were deliberately indifferent to the constitutional rights of those affected.

8. **Defendants John and Jane Doe Deputy District Attorneys 1-100**: These Defendants are individuals employed or formerly employed by the Salt Lake County District Attorney's Office at all relevant times and are sued in their individual and official capacities. These Defendants personally participated in, supervised, or failed to intervene in the issuance of unlawful subpoenas or the enforcement thereof despite their special duties and expected fidelity to the law as officers of the court. Their true names and capacities are unknown but will be ascertained through discovery.

## CLASS ACTION ALLEGATIONS

9. **Definition of the Class:** Plaintiff brings this action under Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of a class of similarly situated individuals. The proposed class is defined as:

> **All persons who, from formation of the District Attorney Subpoena scheme described herein, to present and going forward, have been or will be compelled to appear at the Salt Lake County District Attorney's Office by means of a "DA Subpoena" or similar document issued by the Salt Lake County District Attorney (without a court order or legal authorization) under threat of contempt sanctions, and who, upon appearing, were searched, detained, held, or not free to leave for any period of time, interrogated by Defendants, or then directed to the courthouse for continued unlawful search and detention until released by the Court. The class seeks declaratory and injunctive relief to stop the practice, as well as compensatory or liquidated damages to be determined as appropriate.**

10. **Ascertainability:** The class members can be identified through Defendants' records of issued subpoenas and logs of witness appearances. Defendants have records of whom they subpoenaed to the DA's Office and on what dates. The class is sufficiently ascertainable based on objective criteria (receipt of a DA-issued subpoena, containing a distinct bar code in Ms. Bills' case, and subsequent search and detention).

11. **Numerosity:** The class is so **numerous** that joinder of all members is impracticable. On information and belief, Defendants have issued many such "DA Subpoenas" as part of an

ongoing practice over the course of several years, perhaps nearing a decade. **Thousands** of individuals are believed to have been subjected to this practice, and future individuals are at risk of being subjected to it if it is not enjoined. The precise number of class members is known to Defendants and can be ascertained from their records, but it is sufficiently high that individual joinder is impractical.

12. **Commonality:** There are **questions of law and fact common** to all class members, which predominate over any individual issues. These common questions include, but are not limited to:

- Whether Defendants issued subpoenas or subpoena-like documents without judicial approval, requiring individuals to appear at the DA's Office under threat of contempt;

- Whether requiring individuals to appear and then searching and detaining them at the DA's Office (without a warrant, court order, or probable cause) constitutes a "search" or "seizure" under the Fourth Amendment;

- Whether Defendants' conduct in issuing fraudulent subpoenas and searching and detaining witnesses in the DA's Office violates the Fourth Amendment right against unreasonable searches and seizures;

- Whether Defendants' directives to subpoena recipients to travel from the DA's Office to the courthouse under authority of the fraudulent subpoenas, and where the recipients were again searched by Sheriff's deputies and detained under the claimed authority of the subpoenas to compel their testimony until released by the Court also violates the Fourth Amendment right against unreasonable searches and seizures;

- Whether such conduct violates the Fourteenth Amendment substantive due process rights of those individuals;

- Whether Salt Lake County (through the District Attorney's Office, DA Gill and CDDA Hall as policymakers) had a policy, practice, or custom of issuing these subpoenas and searching and detaining witnesses, such that the County is liable under *Monell*;

- Whether Defendants acted under color of state law and are liable to class members for damages under 42 U.S.C. § 1983;

- Whether the class is entitled to declaratory and injunctive relief to halt the unlawful subpoena and search and detention practice; and

- What relief (including declaratory, injunctive, compensatory, and punitive relief) is appropriate for the class as a whole.

These questions are common to all class members. The **same conduct by Defendants** is at issue for every class member, and answering these questions will resolve central issues in one stroke for everyone in the class.

13. **Typicality:** Plaintiff Tamera Bills' claims are **typical of the claims of the class**. Ms. Bills, like all class members, was subjected to the Defendants' unlawful subpoena scheme: she received a nearly identical subpoena issued by the DA's Office, complied under threat of contempt, and was subsequently searched and detained at the DA's Office against her will for a period of time until released with the directive to travel to the courthouse to give testimony under the fraudulent subpoena. The injuries she suffered (loss of liberty, etc.) arose from the same practice and policies that injured other class members. Her claims are based on the **same legal theories** (Fourth Amendment, Fourteenth Amendment, and *Monell* liability) as the claims of the class. There are no unique defenses applicable only to Ms. Bills; rather, Defendants' likely defenses (such as assertions of immunity or arguments that no seizure occurred) will be common to all class members' claims.

14. **Adequacy:** Plaintiff Bills will **fairly and adequately protect the interests of the class**. She has no conflicts of interest with other class members. She seeks the same declaratory/injunctive relief and has the same types of claims and injuries as the class. Plaintiff has retained counsel experienced in civil rights litigation and class action practice. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the class and have the resources and expertise to do so.

**15. Rule 23(b)(1)(A) and (B) – Varying Adjudications and Individual Member's Interests:** (A) Given the commonality and typicality among putative class members, plus the simple and straightforward claims, **inconsistent adjudications are almost certainly unlikely among putative class members**. Moreover, putative class members would be free to opt out or intervene in any class adjudications or resolutions, thus their individual interests would not be impaired by the outcome.

16. **Rule 23(b)(2) – Grounds for Injunctive Class Relief:** This action is proper under **Rule 23(b)(2)** because Defendants have **acted or refused to act on grounds generally applicable to the class**, making final injunctive and declaratory relief appropriate for the class as a whole. The core of this case is Defendants' **uniform policy and practice** of issuing *ultra vires* subpoenas to witnesses, causing them to be searched and seized in violation of the Fourth and Fourteenth amendments; an injunction against such conduct will protect every class member simultaneously.

17. **Rule 23(b)(3):** To the extent the Court deems it necessary for damages calculations, Plaintiff alternatively seeks class certification under **Rule 23(b)(3)** for issues of liability and damages, as common questions predominate and a class action is superior for adjudicating these claims. That is, (A) the harm to individual putative members is relatively minimal for what amounts to an unconstitutional search and detention for 30 minutes, give or take, plus the resulting search and detention in court until released by the Court, leaving those members unlikely to pursue, let alone seek control over, the litigation. It is (B) unknown whether others have sought relief for similar or the same claims; to Plaintiff's knowledge, Plaintiff's counsel and a now-deceased colleague are the only attorneys to have raised these issues in Salt Lake County at any level (i.e., moving to quash the illegal subpoenas in individual district court cases). (C): Given that the claims arise under U.S.C. subsections 1983 and 1988, it is almost certain that

Defendants would seek to remove the action to this Court if Plaintiff were to file in a Utah state court. Finally, (D), where Defendants possess records identifying putative class members by name, address and, quite likely, by phone number and e-mail address, managing and informing the putative class members as appropriate and necessary will be a relatively simple endeavor.

18. **Rule 23(g): Qualifications of Plaintiff's counsel R. Shane Johnson.**

    i.    Johnson has spent years researching and considering pursuing this class action suit and has done so in earnest in the preceding weeks given sufficient time to focus primarily on this action going forward and upon learning recently the practice continues unabated despite CDDA Hall's notice of its illegality years ago;

    ii.    Johnson co-counseled a successful class action lawsuit in this Court styled as *May v. Utah Department of Corrections*, Case No. 2:18-cv-00854, resulting in a settlement compelling UDC to screen and treat all inmates suffering from chronic hepatitis C. Johnson's participation included researching and co-drafting the complaint, meeting with incarcerated class representatives for informational and strategy sessions, preparing and providing discovery, drafting discovery requests, drafting Motion for TRO, drafting Motion for class certification, drafting and disseminating class notifications, negotiating the settlement with representatives from the Utah Attorney General's Office, seeing those settlements through the bureaucratic processes of the Utah Legislature and Utah Governor's Office, and monitoring compliance for the duration of the settlement agreement for years thereafter. Johnson also acted as lead counsel in a proposed class-action lawsuit styled as *Bivens v. SLC Corp.*, 2017 UT 67, which was dismissed under Utah R. Civ. P. 12(b)(6) and affirmed on appeal. Johnson also co-counseled a subsection 1983 lawsuit in this Court, styled as *Hemingway v. Russo*, Case No. 2:2016-cv-00313,

which resulted in a monetary settlement against the city of Cottonwood Heights on the second day of trial for alleged civil rights violations by the municipality's police officers. Johnson is currently sole counsel in this Court in other pending subsection 1983 suits against Cottonwood Heights police officers styled as *Ellis v. Morzelewski*, Case No. 2:2021-cv-00639, and against a constable and Washington County officials in the .

  iii.    Johnson's practice has focused primarily on criminal defense (particularly constitutional criminal procedure) and civil rights litigation for his entire legal career, beginning in 2012. He authored *Use it or Lose it: A Criminal Defender's Guide to the Utah Constitution*, 2 Utah J. Crim. L. 1 (2015).

  iv.    Knowing the demands of a subsection 1983 class-action lawsuit, Johnson has limited his practice sufficiently to devote the time and effort necessary to prosecute this action. Although the number of putative class members is relatively large, requisite notices and communications will require relatively minimal monetary resources given Defendants' access to their identities and last known addresses, etc., plus the advent of technological advances (AI) that would streamline these processes. Incidentally, Ms. Bills' DA Subpoena contained a UPC bar code and the number 124243, strongly suggesting the DA's Office tracks all aspects of the subpoenas it issues. At that, Johnson is willing and able to devote the resources necessary to prosecute this action.

## FACTUAL ALLEGATIONS

20. **Utah Law on Subpoenas in Criminal Investigations:** Under Utah law, prosecutors enjoy certain legal mechanisms to compel through subpoena power out-of-court witness appearances to obtain testimony or evidence in criminal matters, **but those mechanisms require court involvement and adherence to specific procedures**. Compelling in-court witness

appearances to provide testimony in criminal matters via subpoena power is relatively straightforward, and may be accomplished unilaterally by attorneys without court involvement. The DA Subpoena scheme is a Frankenstein's monster stitched together with sheer extrajudicial pluck.

21. **Utah Rule of Criminal Procedure 14(a)(1)** governs subpoenas issued to witnesses, and permits attorneys in a criminal action in relevant part to unilaterally issue a "subpoena to require the attendance of a witness…**before a court, magistrate or grand jury**." *See* Utah R. Crim. P. 14(a)(1) (Effective 1/1/2020) (emphasis added). This rule permits the issuance of subpoenas to compel the attendance of witnesses to no place other than those identified. **The District Attorney's Office is conspicuously omitted from this list** of permissible officials before whom a witness may be compelled by subpoena to appear.

22. **Utah Rule of Criminal Procedure 14(a)(2)** *reinforces* the limits articulated in Rule 14(a)(1), stating in relevant part that "[a] subpoena may command the person to whom it is directed to **appear and testify or to produce in court** or to allow inspection of records, papers or other objects."

23. **Utah Rule of Criminal Procedure 14(a)(8)** mandates in relevant part that when a party seeks to preserve testimony of a witness who may be unavailable at trial that:

> [t]he party may, **upon notice to the other, apply to the court for an order that the witness be examined conditionally by deposition**. **The party must file an affidavit** providing facts to support the party's request. Attendance of the witness at the deposition may be compelled by subpoena. **The defendant shall be present at the deposition** and the court will make whatever order is necessary to effect such attendance."

Utah R. Crim. P. 14(a)(8) (Effective 1/1/2020) (emphasis added).

24. **Utah Code § 77-22-2,** on the other hand, permits prosecutors to utilize the Court's subpoena power to "conduct a criminal investigation," including issuing subpoenas to witnesses

13

for examination at a time and place other than a scheduled court proceeding before a court, magistrate or grand jury, respectively, as required by Rule 14(a)(1). *See*, *i.e.*, Utah Code §§ 77-22-2(2), -(3)(a)(i), and -(4)(a)(i).

25. However, to obtain, issue and execute such an investigative subpoena under Section 77-22-2, the prosecutor must follow a litany of procedural prerequisites and adhere to substantive safeguards, including: **applying to the court** and showing **good cause** why each individual subpoena is related to the investigation and should issue; electronically or otherwise **record the witness's sworn testimony**; state in the subpoena the time and place for the examination, that the subpoena is in aid of a criminal investigation, and that the person subpoenaed has the **right to have counsel present**; **provide witness fees and reimburse witness expenses**; advise witnesses upon examination the general subject matter of the investigation, the **privilege at any time to refuse to answer questions that may result in self-incrimination**, that **information provided may be used against the witness** in criminal proceedings, **the right to have counsel present**, and, if the prosecutor has substantial evidence that the subpoenaed witness has committed a crime under investigation, **inform the witness of their target status** and the nature of the charges under consideration. *See* Utah Code §§ 77-22-2(1)-(5).

26. **Defendants' "DA Subpoena" Scheme:** In disregard of these legal requirements, the Salt Lake County District Attorney's Office – under the direction, approval and participation of DA Gill and CDDA Hall – developed and implemented a practice of issuing its **own *ultra vires* investigative subpoenas, without judicial approval**, to witnesses, victims, law enforcement agents, or other individuals during criminal investigations. These documents were made to **resemble officially authorized court subpoenas**. They inform the recipients they are **commanded to appear** at a specified date and time **at the District Attorney's Office** (typically

14

30 minutes before scheduled court hearings). They threaten recipients that **failure to appear could result in punishment for contempt of court (read, arrest, jail time and/or fines)** – implying the subpoenas carry the force of law while omitting they are extrajudicial inventions. *See* **DA Subpoena No. 124243 to Tamera R. Bills, plus Parking Pass, filed herewith as Exhibit 1.**

27.  In Ms. Bills' case, the DA Subpoena was accompanied by a parking pass, with the first line of the pass reinforcing Defendants' extrajudicial command: "You are subpoenaed to appear directly at the District Attorney's Office located at 35 East 500 South, Salt Lake City, Utah, directly west of the Scott M. Matheson Courthouse." ***See id.*, Exhibit 1**.

28. Upon information and belief, all subpoenaed witnesses received the same or a similar parking pass with the same or similar language along with their DA Subpoena.

29. **Utah Rules of Criminal Procedure 14(a)(3) and (a)(4) (evincing Defendants' additional extrajudicial conduct)** requires personal service of properly-issued subpoenas akin to Utah Rule of Civil Procedure 4(d)(1) and "return of service of a subpoena must be made promptly to the court and to the person requesting that the subpoena be served, stating the time and by whom service was made." *See* Utah R. Crim. P. 14(a)(3) and (a)(4).

30. **In fact, Utah Rule of Criminal Procedure Rule 14(C) explicitly incorporates Utah Rule of Civil Procedure 45** insofar as it "govern[s] the content, issuance, objections to, and service of subpoenas to the extent those provisions are consistent with the Utah Rules of Criminal Procedure." The governing analogous civil rule mandates in relevant parts not inconsistent with Rule 14, that a subpoena must: "include a notice to persons served with a subpoena in a form substantially similar to the approved subpoena form," which includes notice of the right to object and how to go about it (Rule 45(a)(1)(E)); that service "shall be made as

provided in Rule 4(d)" (Utah R. Civ. P. 45(b)(1)); and that the person effecting service "must file proof of service stating the date, place, and manner of service (Utah R. Civ. P. 4(e)(1)).

31. **The DA Subpoenas fail to comply with Rule 45's mandates** that proper service "must" be made personally upon the individual served under Rule 4(d), be accompanied by a "notice to persons served with a subpoena" under Rule 45(a)(1)(E), and be followed by the filing of proof of service by the person effecting service under Rule 4(e)(1).

32. That is, **the DA Subpoena scheme abdicates Defendants' fidelity to virtually every Utah law or rule governing the awesome power to compel witness searches, detentions, interrogations and courtroom testimony**. Defendants resort instead to extrajudicial deceptions and extortionate threats of arrest, jail, and fines to achieve their ultimately incongruous duty and objective to "take care that the laws be faithfully executed."

33. In Ms. Bills' case, she received the DA Subpoena, dated March 12, 2025, via standard U.S. Mail, no return receipt, and no proof of service has to date been filed in the underlying case styled as *State of Utah v. Tyler Duane Bills*, Third District Court Case No. 251900610 (and 221906395).[1]

34. Upon information and belief, Defendants also simply mailed the DA Subpoenas to the putative class members and filed no proof of service with the Court.

35. Ms. Bills' DA Subpoena did not include a "notice to persons served with a subpoena" and, upon information and belief, neither did those DA Subpoenas issued to the putative class members.

---

[1] Both cases were scheduled on the same date and time, April 14, 2025, at 1:30 p.m. before the Honorable Third District Court Judge Vernice Trease for preliminary hearing in Case No. 251900610 (listed on the DA Subpoena), and for an order to show cause hearing in Case No. 221906395 (not listed on the DA Subpoena).

36. Upon information and belief, it is Defendants' pattern, practice, custom and official or de facto policy to ignore Utah R. Crim. P. 14(a)(1) thru (a)(4) and 14(c); Utah R. Civ. P. 45(a)(1)(E) and (b)(1); Utah R. Civ. P. 4(d) and (e)(1); along with Utah Code §§ 77-22-2(1) thru (5). These procedural mandates and substantive safeguards against just the type of abuses evinced by the DA Subpoena scheme were cast by the wayside in Ms. Bills' case and, upon information and belief, the same went for the DA Subpoenas issued to all putative class members for untold years before this action was filed, and the scheme continues unabated.

37. Upon information and belief, **Defendants' failure to provide the verifiable "paper trail" required by Rule 14(a)(3) and (a)(4) has the effect, if not the purpose, of concealing Defendants' extrajudicial DA Subpoena scheme**. That is, no returns of service filed, thus no methods of service to scrutinize.

38. These DA Subpoenas are "issued" officially and personally by DA Gill **– not by a judge or court clerk** – with the imprimatur of lawful authority to none-the-wiser recipients as an effective end-run around the procedural and substantive constitutional safeguards written into the Utah Rules of Criminal Procedure and Utah Code.

39. The extrajudicial DA Subpoenas are created by the DA's Office with the effect, if not the design, of compelling an *ex-parte* **captive audience** with witnesses to be examined and influenced by prosecutors and, upon information and belief, by victim advocates and police.

40. Upon information and belief, the contents of these **extrajudicial interrogations are neither recorded nor provided to criminal defendants**, in violation of the DA Office's discovery obligations.

41. Moreover, upon information and belief, Defendants' line prosecutors routinely request continuances of crucial hearings (like preliminary hearings, motions to suppress, and trials) for

lack of necessary witnesses, **proffering to the Court that the absent witness(es) had been subpoenaed, while materially omitting that those subpoenas were improper** and without legal force or effect for all the reasons stated herein. The typical result, upon information and belief, is that Courts routinely grant these continuances rather than deny them and actions for lack of proper service and failure to prosecute.

42. **Coercion Under Color of Law:** By issuing the DA Subpoenas under the name and official title of "Sim Gill…District Attorney for Salt Lake County" on a standard-looking court form identifying the parties, judge and case number, Defendants **acted under color of state law** to coerce compliance. Recipients, seeing the subpoena and threat of contempt, understandably treated it as a lawful order of the Court.

43. Defendants intended this result – **the purpose was to compel attendance in a way that a mere "request" or invitation could not**. This was an abuse of the public trust and authority given to prosecutors as officers of the court. **At all relevant times, DA Gill and CDDA Hall knew or should have known** that these subpoenas lacked proper authority, yet they continued to issue them as a matter of office policy and practice.

44. Then-attorney Stewart Gollan (Utah Bar No. 12524, now deceased) executed a sworn declaration for use in *State of Utah v. Rosa Maria Jimenez*, Third District Court Case No. 181910765, dated January 2, 2019. In that declaration, Gollan recounted appearing as counsel for an alleged victim/witness in *State of Utah v. Joseph Martinez*, Third District Court Case No. 181900023. **The alleged victim/witness received a DA Subpoena to appear at the District Attorney's office prior to a preliminary hearing** scheduled for April 10, 2018. Gollan appeared without his client, moved to quash the subpoena for failure to comply with Utah R.

Crim. P. 14(a)(1), and the Third District Court's Honorable Judge Patrick Corum granted the motion to quash on those grounds.

45. Gollan went on to declare: "Subsequent to the Court's finding that the subpoena was invalid, **I encountered Jeff Hall of the Salt Lake County District Attorney's Office** on the street and **informed him that the Court had found that a subpoena issued to compel the attendance of a witness at the District Attorney's office [sic] was invalid** on the basis that the issuance of such a subpoena is not authorized by the Utah Rules of Criminal Procedure." **Stewart Gollan Declaration, filed herewith as Exhibit 2.**

46. On information and belief, DA Gill and CDDA Hall nonetheless directly instructed their deputies to continue using these DA Subpoenas or tacitly approved their use as a standard tool in the office's investigations. Other deputy DAs, Defendants John and Jane Does 1-100, follow this practice routinely, demonstrating a **custom or standard operating procedure** rather than an isolated incident.

47. **Procedure Upon Appearance – Secured Area and Detention:** Upon information and belief, once individuals heed the DA Subpoena and appear at the DA's Office as commanded under threat of contempt, the process involves being stopped at a security checkpoint posted with an armed Sheriff's deputy, only to pass through a magnetometer and submit to an x-ray search of their private belongings followed by the seizure of their person in an enclosed space, encircled by uniformed and armed law enforcement officers, until their detention is extended by direction of a DA's Office staffer, announcing words, or words to the effect that "We're going to send you all over to the court."

48. In sum, upon information and belief, the situation mirrored that of an **investigative detention** or even an **arrest**, **without any of the constitutional safeguards** (no *Miranda*

warnings, no probable cause determination, no opportunity to consult counsel unless they happened to bring one, etc., and indeed the subpoena's language would suggest this was not an adversarial setting where it would occur to bring a lawyer).

49. **At the courthouse**, upon information and belief, under the presumed authority of the *ultra vires* DA Subpoena, recipients are again herded through another security checkpoint posted with armed Sheriff's deputies, again made to pass through a magnetometer and again made to have their personal belongings x-rayed and inspected by a deputy. Upon information and belief, the DA Subpoena recipients then make their way to their assigned courtroom and remain there or nearby, unfree to leave until giving their testimony or being released by the Court.

50. **Plaintiff Tamera Bills's Experience:** Ms. Bills was a target of the unlawful DA Subpoena scheme. Her experience illustrates how Defendants' policy was applied:

    A. **Receipt of Subpoena:** On or about March 2025, Ms. Bills received a document purporting to be a subpoena, issued by the Salt Lake County District Attorney's Office, particularly by DA Gill.

    B. The document, titled "SUBPOENA," with DA Gill identified by name and title as the issuing official, commanded **Ms. Bills to appear at the Salt Lake County District Attorney's Office** on April 14, 2025, at 1:00 p.m. for a scheduled 1:30 p.m. scheduled preliminary hearing.

    C. The DA Subpoena referenced Ms. Bills' ex-husband's prosecution (for felony protective order violations committed against Ms. Bills).

    D. The DA Subpoena stated in all caps that "DISOBEDIENCE MAY BE PUNISHED AS A CONTEMPT OF SAID COURT."

E. The DA Subpoena omitted the courthouse address and the courtroom number where the scheduled preliminary hearing was to be held.

F. **Coercion to Attend:** The subpoena alarmed and compelled Ms. Bills to act. **She believed it to be an official court order** that she was legally obligated to obey.

G. **Ms.** Bills, scheduled to work on the same date, reached out to assigned Deputy District Attorney Scottie Bowden via e-mail on March 17, 2025, stating that she would provide a Utah R. Evid. 1102 sworn statement in lieu of live testimony, as she had done before in the case. DDA Bowden responded on March 25, 2025, that the law for admission of so-called "1102 statements" had changed, and Ms. Bills "will need to be present for the hearing at the date and time listed on the subpoena."

H. The DA Subpoena's threat of "contempt of court" and the authoritative format led her to conclude that **not showing up was not an option** and could result in her arrest or punishment.

I. At no point did any court contact her to explain her rights, nor did the DA Subpoena advise that Ms. Bills' appearance was optional or subject to challenge – rather, it, along with ADA Bowden's admonition, gave every impression of mandatory legal force.

J. Feeling she had no choice, Ms. Bills rearranged her schedule to comply and prepared to attend at the stated place, date and time.

K. Days prior to the hearing date, Ms. Bills consulted counsel (current counsel Mr. Johnson) to inquire about her options, stressing that she dreaded the stress and anxiety of giving live testimony against her abusive ex-husband. Mr. Johnson

advised he did not believe the DA Subpoena was valid or enforceable, however, that determination would be up to a judge and, to be safe, Ms. Bills should appear at the DA's Office.

L.  Ms. Bills retained Mr. Johnson to make a limited appearance at the hearing to challenge the validity of the DA Subpoena on Ms. Bills' behalf. Ms. Bills entered the courthouse, but not the appointed courtroom, and remained on-call should the Court rule against the challenge and compel her appearance. Instead, the Court set the matter for briefing and set a motion hearing for June 2, 2025.

M.  **Appearance at DA's Office:** On April 14, 2025, Ms. Bills appeared at the DA's Office at the address specified in the DA Subpoena.

N.  **Ms.** Bills arrived a few minutes early to ensure compliance, and she presented herself at the security checkpoint/reception area, informing the deputy she was there in response to a subpoena.

O.  Ms. Bills was required to **pass through a magnetometer and pass her purse with personal belongings through an x-ray machine for the deputy's inspection**.

P.  The armed deputy at the security checkpoint then directed Ms. Bills to check in at the next reception booth (enclosed by protective glass) with **a woman who then checked Ms. Bills' name off of a list and directed her to wait in an adjacent waiting room**. This room was also enclosed by glass on all sides, with seating for approximately 50 people, and lined with several glass-enclosed conference rooms.

Q.  This DA's Office staffer gave Ms. Bills no instruction on what to do or expect other than to "wait."

22

R. Among 20-plus people in the waiting room, there were approximately four uniformed law enforcement officers from various agencies. Several Sheriff's deputies lingered outside of the waiting room.

S. Inside the waiting room, a single law enforcement officer and a single plain-clothes gentleman met with an official whom Ms. Bills has since identified as a deputy district attorney (tall, dark hair, olive skin, heavy set, attached to oxygen). One encounter with this DDA occurred inside a conference room and one occurred outside in the waiting room.

T. **Detention in Waiting Room:** Ms. Bills **waited in the DA's Office for approximately 32 minutes** with no one attending to her. During this time, she was **not free to leave**. She was never told she could leave; to the contrary, her only instruction was to "wait" and the DA Subpoena "COMMANDED" her to be there. The door back to the lobby was guarded, and leaving would mean making her way past a Sheriff's deputy who knew she was there at the command of a subpoena, legitimate or not. Ms. Bills, having been subpoenaed and threatened with contempt, fully believed that **if she left before being officially dismissed, she could face legal consequences**. She felt **anxious and intimidated**, sitting there not knowing if she would be questioned or why she was really subpoenaed.

U. Despite being a private citizen with no charges against her, Ms. Bills was, for that period, **demonstrably under the control of the DA's Office and Salt Lake County Sheriff's deputies – she was seized** and her freedom of movement was restrained by authority.

23

V.  **No Interrogation for Ms. Bills:** In Ms. Bills's case, **no prosecutor ever came to interview or question her individually.** Taken with the vast majority of other detainees who spoke to no officials during their detention, it is conceivable that the purpose of the DA Subpoena scheme is merely to corral witnesses, verify their appearances, detain them long enough to facilitate the mass migration to the courthouse, and pass the information along to line prosecutors for the sake of better triaging their caseloads.

W.  After Ms. Bills' approximately **32-minute detention**, another DA's Office staffer announced, without explanation, **"We're going to send you all over to the court," and "They said send everyone over."**

X.  Ms. Bills asked where she was supposed to go to meet with assigned DDA Scottie Bowden, to which the staffer responded: "Not here. He's not coming here. I was just told that they are meeting everyone – so **just follow the crowd; they're all going to the same place**."

Y.  Ms. Bills followed the crowd to the Court's west-side security checkpoint where a long queue formed. She proceeded to another entrance, entered the courthouse and waited nearby for word from Mr. Johnson. The case for which Ms. Bills was subpoenaed to testify was called at 2:24 p.m. and concluded at 2:37 p.m., whereupon Mr. Johnson phoned Ms. Bills and advised she would not have to appear and testify that day, but the issue would need to be resolved through litigation over the next matter of months. Ms. Bills was disheartened by this news, but the ordeal inspired her to pursue this lawsuit.

Z. **Lack of Due Process:** At no time before or during Ms. Bills's compelled appearance at the DA's Office was she brought before a judge or advised by any official of her rights. The entire process took place **wholly outside the judiciary**. It was a unilateral extrajudicial executive action forcing a civilian to come in and stay put at a government office. Ms. Bills, suspected of no crime, had no legal obligation to speak to prosecutors absent a valid subpoena or court order – yet Defendants **manufactured a scheme that trapped her into compliance** with no legal basis. This caused her to suffer the **loss of liberty (even if for 90 minutes or so between the DA's Office and the courthouse)**, **emotional distress** (fear, stress, confusion about why she was being forced against her will), and **inconvenience and indignity** of being treated like someone who could be detained at will. She also lost personal time and had to arrange with her employer to call out and appear under duress.

51. **Other Class Members' Experiences:** Ms. Bills's experience was not unique, except perhaps in the details that she was not interrogated and she appeared in court through counsel rather than in-person. She nonetheless appeared and waited in the courthouse for the case to be called and concluded out of fear the Court would rule the DA Subpoena enforceable.

52. All recipients who complied with the DA Subpoena share the common factor that they were **compelled by a phony legal order to come in, submit to searches and, once inside the waiting room, were not at liberty to leave until the DA's Office directed them to the courthouse.**

53. This is an **office-wide practice** created, condoned and encouraged by those in charge including, and most disappointingly, DA Gill.

54. Upon information and belief, the scheme was used as a tactic to control witnesses and gather information **without the hurdle of obtaining a material witness warrant or a court-approved subpoena** and without the presence of defense attorneys that would normally accompany formal testimony or deposition. It was essentially a way to **shortcut due process and the Fourth Amendment to seize people at the prosecutors' convenience**, to command an ex-parte audience with witnesses, and to verify their appearance for line prosecutors facing overwhelming caseloads to prepare for their calendars.

55. **Continued Fourth Amendment Violation Through Courthouse Proceedings**: The seizure of Ms. Bills and similarly situated class members did not terminate when they were physically permitted to leave the DA's Office. Rather, the seizure continued as they were herded through security checkpoints and into courtrooms under the imprimatur of authority from an official-looking and threatening subpoena sans judicial oversight or valid legal process. The use of prosecutorial authority to command appearance, then redirect witnesses under color of law to a judicial proceeding – without lawful basis – constitutes a single, continuing Fourth Amendment seizure. Under *Manuel v. Joliet*, 580 U.S. 357 (2017), such detention remains governed by the Fourth Amendment so long as it rests on defective or non-existent legal process.

56. **Clearly Established Illegality and Notice to Defendants: The unconstitutionality of this scheme is or should be obvious** to any reasonable official. Longstanding precedent makes clear that **absent a valid court order or warrant, the government cannot compel a private citizen to appear for questioning and detain them against their will**.

57. The **Fourth Amendment** requires **probable cause and a warrant (or a specific exception)** to detain someone for more than a brief investigative stop, and even a brief stop

requires reasonable suspicion and circumstances justifying it – none of which were present here

(these were not spontaneous street stops, but planned detentions without individualized cause).

58. Moreover, federal appellate courts interpreting **Fed. R. Crim. P. 17 (the materially no
different federal analogue to Utah's Rule 14)** have **condemned the misuse of subpoenas for
investigative purposes**.[2] It has been clearly established in multiple circuits, including the Tenth

---

[2] *See, i.e. **United States v. Villa-Chaparro**, 115 F.3d 797, 804–05 (10th Cir. 1997)
("Undoubtedly, the government's practice of using the court's subpoena power to compel
witnesses to attend ex parte interviews is improper."); **United States v. LaFuente**, 991 F.2d 1406,
1411 (8th Cir. 1993) ("The practice of using trial subpoenas to compel witnesses to attend
pretrial conferences is improper under Rule 17… The government may not use trial subpoenas to
compel prospective trial witnesses to attend pretrial interviews with government attorneys.");
**United States v. Elliott**, 849 F.2d 554, 557 (11th Cir. 1988) ("The court's subpoena power may
not, however, be used by the United States Attorney's office as part of its own investigative
process."); **United States v. Keen**, 509 F.2d 1273, 1274–75 (6th Cir. 1975) (Finding it "highly
improper" and "clearly unauthorized and improper" for prosecutors to use subpoenas to compel
witness attendance at "a proceeding other than an authorized one," since Rule 17 "permits a
subpoena … to be issued only for the purpose of compelling the attendance of witnesses or the
production of evidence at a formal proceeding."); **United States v. Hedge**, 462 F.2d 220, 222–23
(5th Cir. 1972) (under Rule 17(a), "a subpoena is only returnable at the place of trial," thus it is
improper to subpoena witnesses for out-of-court interviews); **United States v. DiGilio**, 538 F.2d
972, 985 (3d Cir. 1976) (emphasizing that "Rule 17 does not … authorize the use of grand jury
subpoenas as a ploy for the facilitation of office interrogation. Neither the FBI nor the United
States Attorney has been granted subpoena power for office interrogation outside the presence of
the grand jury."); **United States v. Standard Oil Co.**, 316 F.2d 884, 897 (7th Cir. 1963) ("The rule
does not authorize the government or the defense to subpoena a witness and require him to report
at some place other than where the trial is to be held."); **Perez v. United States**, 968 A.2d 39, 76 –
77 (D.C. 2009) (The D.C. Court of Appeals surveyed the federal authorities and "adopt[ed] the
views of … federal appellate courts that the use of subpoenas intended for grand jury witnesses
for the purpose of prosecutorial investigation is improper."); **In re Melvin**, 546 F.2d 1, 5 (1st Cir.
1976) (although a prosecutor has broad latitude to issue subpoenas compelling witness
appearances before a grand jury, "he may not use his subpoena powers under Rule 17 to gather
evidence without the participation of the grand jury," particularly by compelling through
subpoena a grand jury target to appear for a lineup "outside the grand jury room at a proceeding
not under the grand jury's immediate supervision…");

Circuit Court of Appeals, that **prosecutors may not use trial subpoenas or similar devices to compel witnesses for off-the-record or off-site interviews or investigative interrogations** (those subpoenas are to be used only to compel appearance at a formal proceeding, like a hearing, trial, or grand jury).

59. In other words, **prosecutors cannot do an end-run around the Fourth and Fourteenth Amendments by disguising an extortionate demand letter as an official "subpoena."** Any reasonable prosecutor would know that **forcing someone to come to the DA's Office under threat of contempt, and then holding them there, is a seizure of the person** – and if done without court authority, warrant, or an emergency, it's an unreasonable one. Given prosecutors' daily work routines and responsibilities, it may as well be written in their job descriptions that they know these elementary, yet critical, truisms of Utah law and the U.S. Constitution.

60. **Policy, Custom, or Supervision Failures:** The actions described were not accidental or rogue acts by low-level staff; they were a **policy or custom of the Salt Lake County DA's Office**. DA Gill either formally adopted it (by instructing his prosecutors to use investigative subpoenas in this way) or at minimum **knew of and approved it** informally by allowing it to continue once he was aware. There were **no training or supervision measures** put in place to stop prosecutors from issuing unauthorized subpoenas – in fact, the practice was widespread enough that it was effectively an office custom. Salt Lake County, acting through Gill and possibly other policymakers, **failed to train or discipline** prosecutors regarding the proper use of subpoenas and the constitutional limits, despite the obvious need for such training given the pattern of misuse. This failure and tacit approval amounted to **deliberate indifference** to the rights of witnesses and others. The **moving force** behind the violations of Ms. Bills's and class members' rights was this policy/custom originating from the highest levels (DA Gill) and

permeating the office. In short, *Monell* **liability** is triggered because the unconstitutional practice was directly attributable to Salt Lake County's decision-makers or established customs.

**61. Injuries Suffered by Plaintiff and Class:** As a direct result of Defendants' actions:

A. **Ms. Bills** suffered an **unlawful deprivation of her liberty and right to privacy under the Fourth Amendment**. Even a 30-to-90-minute detention against one's will is a significant constitutional injury, to say nothing of having strangers peer into the personal contents of one's purse. Aside from lost time from work, Ms. Bills also endured significant **emotional distress**, including: fear of being punished if she did not comply; powerlessness against what felt like treatment fit for a common criminal; stress while waiting in custody not knowing what would happen on top of the fraught anticipation of whether she would be compelled to give live testimony against her abusive ex-husband; humiliation, indignity, insecurity and personal violation at being treated like a pawn no more important than the bar code atop her DA Subpoena, left to the mercy of these officials' whims rather than being treated like the crime victim she is, deserving of dignity, compassion or, at the very least, a bureaucratic system sanctioned by law.

B. **Class members** similarly suffered **Fourth Amendment injuries** (unreasonable searches of their private property and seizures of their persons for varying lengths of time) and **violations of substantive due process** (being subjected to an arbitrary exercise of power without lawful process). Some class members may have additional damages such as lost wages (if they had to miss work to comply), continued emotional distress, or other consequences stemming from the detention

and interrogation (for instance, some may have felt intimidated into providing

information without counsel).

C. The **ongoing risk**: If not stopped by the Court, Defendants may continue to issue

such subpoenas and detain more people, causing irreparable harm in the form of

continued constitutional violations. For example, the cases involving Ms. Bills ex-

husband remain pending, depend upon on Ms. Bills' testimony, and nothing

currently stands in the way of Defendants' issuing her identical DA Subpoenas.

The **injunctive relief** sought is necessary to prevent future harm to class members

who will otherwise be forced to submit to this unlawful scheme.

62. **Absence of Legitimate Justification:** Defendants had **no legitimate justification** or

excuse for bypassing the normal legal processes. If the DA's Office truly needed to secure a

witness's testimony or presence, there were lawful avenues available (such as seeking a material

witness warrant or investigative subpoena under Utah Code, convening a grand jury and issuing

a subpoena through that process, inviting witnesses to voluntarily come in for consensual

discussions, or simply cornering witnesses in court under properly-issued Rule 14(a)(1)

subpoenas).

63. The fact that Defendants chose this shortcut underscores that it was a **deliberate strategy

to exert control and pressure** on individuals in a way that circumvents judicial oversight and

constitutional safeguards. This strategy cannot be justified by any exigency or emergency – it is a

standard practice, not a one-time urgent necessity. Therefore, the searches, seizures and coercive

subterfuge are **unreasonable by any measure**.

64. **Summary of Violations:** In sum, Defendants' conduct amounted to (a) **unlawful

searches and seizures** of Ms. Bills and the putative class members in violation of the Fourth

Amendment, and (b) an **abuse of power that deprived them of liberty and privacy without due process of law**, in violation of the Fourteenth Amendment's substantive due process clause. All of this was done under color of state law, by officials wielding their government authority. Plaintiff now seeks justice and relief for these violations, for herself and all those similarly situated and harmed.

## CLAIMS FOR RELIEF

Each of the following causes of action is asserted by **Plaintiff Tamera Bills individually and on behalf of the putative class** of similarly situated individuals, against each of the Defendants as specified. All allegations above are incorporated by reference in each count below.

### Count I – Unreasonable Search and Seizure in Violation of the Fourth Amendment
(Under 42 U.S.C. §§ 1983 and 1988 Against DA Gill, CDDA Jeff Hall and John and Jane Does 1-100, Individually and in Their Official Capacities, and Against Salt Lake County via *Monell*)

65. **Fourth Amendment Rights:** Plaintiff and class members have the right under the Fourth Amendment to the U.S. Constitution to be secure in their persons and effects against unreasonable searches and seizures. These rights are **clearly established**.

66. A "seizure" of a person occurs when an official, by means of physical force or show of authority **restrains the liberty of an individual such that a reasonable person would not feel free to terminate the encounter or leave**.

67. A "search" of a person occurs when a person exhibits a subjective expectation of privacy in the place or item searched that is objectively reasonable, and an official intrudes upon that reasonable expectation through use of any of the human senses, whether augmented or assisted through technology.

68. **Seizure of Plaintiff and Class at DA's Office:** Defendants, acting under color of state law, **seized** Plaintiff and class members within the meaning of the Fourth Amendment.

Specifically, by issuing DA Subpoenas under threat of legal penalty and then detaining individuals at the DA's Office (through use of armed law enforcement officers, security checkpoints, and commands to remain in an enclosed waiting waiting area), Defendants restrained Plaintiff's and class members' freedom of movement. **A reasonable person in Plaintiff's position would not feel free to ignore the DA Subpoena or to leave the DA's Office until explicitly permitted**.

69. Plaintiff did not feel free to leave and remained for about 30 minutes solely due to the command of the DA Subpoena and Defendants' show of authority and, upon information and belief, so did 20-plus others detained with Plaintiff who did not leave until released. This was a seizure of Plaintiff and these putative class members for purposes of the Fourth Amendment.

70. **Continued Seizure of Plaintiff and Class at Courthouse:** With the spontaneous admonition to Plaintiff and the other detainees by a DA's Office staffer that "We're going to send you all over to the court," Defendants escalated and extended Plaintiff's and other detainees' detention by directing them to the courthouse under authority of the *ultra vires* DA Subpoenas. While Plaintiff entered the courthouse through a separate entrance, the rest of the detained putative class members herded into a queue at a security checkpoint on the west side of the courthouse. There, the other detainees were again forced to pass through a magnetometer and submit to an x-ray-assisted inspection of their personal belongings by a Sheriff's deputy. Upon information and belief, they made their way to designated courtrooms and remained their or nearby, unfree to leave, until giving their testimony and/or being released by the Court.

71. **In Plaintiff's case**, she remained in the courthouse, unfree to leave until an attorney appeared on her behalf, challenged the validity of the DA Subpoena and received permission from the Court to release Ms. Bills pending further litigation. Plaintiff was finally released under

the DA Subpoena's threatening command approximately **100 minutes after her detention began** in the DA's Office.

72. **Unreasonable and Without Probable Cause:** These seizures were **unreasonable** and occurred without any justification under the Fourth Amendment. Defendants suspected Plaintiff and putative class members of no crime, nor were they lawfully arrested under a warrant or upon probable cause. There was **no court order or authorized subpoena** justifying their searches and detentions. **They were witnesses, many of them victims like Plaintiff, inconceivably and unconscionably treated by Defendants no differently than suspected criminals**.

73. **No Consent:** Plaintiff and class members did not voluntarily consent to these detentions. **Compliance with a subpoena under threat of contempt is not consent**; it is coercion. Once at the DA's Office, Plaintiff did not consent to remain in the waiting area but did so only under the imprimatur of lawful authority commanding her to appear and "wait" until released. Any alleged "consent" was tainted by the initial unlawful command and the intimidating circumstances. Thus, Defendants cannot claim that Plaintiff or others consented to the seizure of their persons.

74. **Defendants' Personal Involvement:** Defendants DA Gill and CDDA Hall (individuals) were personally involved in these Fourth Amendment violations. **DA Gill**, as the District Attorney and final policymaker, **knowingly established, directed or permitted the scheme** of issuing *ultra vires* DA Subpoenas commanding the extrajudicial search and detention of witnesses. He either directly ordered such actions or allowed them to continue despite knowledge, thereby **integrally participating** in the unlawful search and seizure of Plaintiff and each putative class member. DA Gill *specifically* issued the *ultra vires* DA Subpoenas to Plaintiff and the putative class members, using his name and official title to compel compliance.

75. **CDDA Hall**, as the chief deputy assigned to oversee the Office's criminal division is, upon information and belief, also a final policymaker who knowingly established, directed or permitted the scheme of using *ultra vires* DA Subpoenas and searching and detaining witnesses. He either directly ordered such actions or allowed them to continue despite knowledge, thereby integrally participating in the unlawful search and seizure of Plaintiff and each putative class member. **CDDA Hall received direct notice that the Third District Court had ruled such DA Subpoenas to be legally invalid and unenforceable as early as 2018, yet he did nothing to curb or correct the scheme**. Along with DA Gill, CDDA Hall acted under color of law and caused the violation of Plaintiff's and putative class members' Fourth Amendment rights.

76. **Official Capacity and *Monell* (County Liability):** The above-described Fourth Amendment violation was carried out pursuant to an **official policy or custom of Salt Lake County**, for which Defendant Salt Lake County is liable under 42 U.S.C. § 1983. As detailed, DA Gill was a final policymaker whose decisions to issue subpoenas in this manner and detain witnesses are attributable to the County. Additionally, the practice was widespread (a custom) such that the County's leadership can be inferred to have known of it. The County (through its DA's Office) failed to train or supervise its prosecutors to prevent such constitutional violations, even after warnings, showing **deliberate indifference** to the obvious risk that citizens would be unlawfully searched and seized. This policy/custom was the **moving force** behind the Fourth Amendment violations suffered by Plaintiff and the class. Therefore, Salt Lake County is also **directly liable** (not vicariously, but via *Monell*) for the unlawful seizures.

77. **Injury:** As a direct and proximate result of Defendants' actions, Plaintiff and class members have suffered harm, including deprivation of their Fourth Amendment rights, loss of liberty, emotional distress, and other damages as described above. Each instance of being

searched and detained under these circumstances constitutes an injury in itself (even if no physical harm occurred).

78. **Clearly Established Right / No Immunity:** The right to be free from such unlawful searches and seizures was clearly established at the time of Defendants' actions. No reasonable public official in 2024 (or during the relevant period) would believe that they could lawfully compel a person to appear for a private interview and hold them there under threat of contempt without a valid court order. Defendants DA Gill and CDDA Hall had fair warning from existing law (including judicial decisions and the obvious text of the Fourth Amendment) that their conduct was unconstitutional. Thus, to the extent they may invoke qualified immunity, **they are not entitled to qualified immunity** for this claim. Their actions were in knowing or reckless disregard of Plaintiff's rights.

**79. Relief Sought:** Plaintiff, on behalf of herself and the class, seeks **declaratory and injunctive relief** declaring Defendants' actions unconstitutional and enjoining Defendants from continuing the practice (as detailed in the Prayer for Relief below). Plaintiff also seeks an award of **compensatory damages** against Defendants for the class members who were unlawfully seized (to compensate for the invasion of privacy, deprivation of liberty and associated harms). Furthermore, because DA Gill and CDDA Hall acted **maliciously, willfully, or with reckless indifference** to the rights of Plaintiff and class members, **punitive damages** are sought against DA Gill and CDDA Hall in their individual capacities to punish and deter such outrageous conduct in the future.

<u>**Count II – Violation of Fourteenth Amendment Substantive Due Process**</u>
(Under 42 U.S.C. §§ 1983 and 1988 Against DA Gill, CDDA Jeff Hall and John and Jane Does 1-100, Individually and in Their Official Capacities, and Against Salt Lake County via *Monell*)

80. **Substantive Due Process Rights:** Plaintiff and class members have a right under the Fourteenth Amendment's Due Process Clause to be free from **executive action that is so egregious, arbitrary, and oppressive that it shocks the conscience** or interferes with rights implicit in the concept of ordered liberty. This substantive due process right protects individuals against certain governmental misconduct even if not specifically addressed by another textual constitutional provision (or in addition to it).

81. **Arbitrary Abuse of Power:** Defendants' conduct as described above **violated substantive due process** because it was an **arbitrary abuse of government power** that shocks the conscience. Specifically, **intentionally tricking or coercing individuals into believing they are legally compelled by a court, and then detaining them without any lawful authority or process, is conduct that is conscience-shocking**. It is an abuse of the fundamental power of the state to deprive someone of their rights to privacy and liberty. The scheme served no legitimate purpose that could not be achieved through lawful means; it was designed to circumvent the justice system. Such deliberate misuse of the badges of law (subpoenas, contempt threats, armed detention) to constrain innocent citizens is conduct that **offends fundamental principles of justice and fair play**.

82. **Deprivation of Liberty Without Due Process:** The Due Process Clause also prohibits **deprivations of liberty without due process of law**. In Plaintiff's case and those of class members, Defendants **deprived them of privacy and liberty (freedom of movement)** without any semblance of due process. There was **no notice or hearing by a neutral magistrate**, no opportunity to contest the summons or detention, no required notice of such an opportunity, and no legal authorization at all. Defendants essentially **took the law into their own hands**, issuing commands and enforcing them outside the court's purview. This is the antithesis of due process.

When the government wishes to compel a person's presence or testimony, the law provides processes an array of legal processes; bypassing all of them and simply searching and seizing witnesses via deceit violates the deep-rooted principle that the government must follow the law before punishing or restraining someone. Plaintiff's unlawful search, 100-plus minute detention, plus the threat of punishment hanging over her amounted to a **de facto punishment or severe intrusion** without due process.

83. **Mens Rea – Deliberate Indifference/Intent:** For substantive due process liability, the actions must be egregious and done with a degree of culpability. Here, Defendants acted **intentionally and with reckless disregard** for Plaintiff's rights. This was not a split-second decision or a negligent oversight; it was a planned policy executed over time. Defendants had time for reflection and chose to continue this course, showing at least **deliberate indifference** to the constitutional rights at stake, if not outright intent to violate those rights for investigatory gain. DA Gill's and CDDA Hall's **deliberate decision to employ fraudulent subpoenas to effect *ultra vires* searches and detentions, even after warnings**, meets any applicable standard of culpability for a due process violation.

84. **Relationship to Fourth Amendment:** Plaintiff acknowledges that the Fourth Amendment specifically covers unreasonable seizures, which is the primary lens for analyzing her detention. This Count II is pled in the alternative and to address any aspects of Defendants' conduct that might not be fully captured by the Fourth Amendment claim. The **subterfuge and abuse of legal process** involved in creating false subpoenas, the deliberate **deception of the target individuals and the court system**, and the **intrusion on personal dignity** are also aspects that implicate substantive due process. If, arguendo, a court found that the Fourth Amendment did not apply to some element of this scheme (for example, the act of issuing a

fraudulent subpoena might be considered prior to the actual "seizure"), then that act still violates due process because it's an **arbitrary governmental deception that leads directly to a loss of liberty**. In any event, Defendants' overall course of conduct can be viewed as **an integrated violation of basic constitutional guarantees of liberty and fairness**.

85. **Defendants' Personal Involvement:** The personal involvement of DA Gill and CDDA Hall described in Count I is equally applicable here. They intentionally set in motion and carried out the actions that constitute the due process violation. DA **Gill** formulated, sanctioned and carried out the unconstitutional policy; and CDDA **Hall** at the very least permitted it despite notice of its unlawfulness. Both did so under color of state law, as part of their official duties, but in a manner that was *ultra vires* **and egregious**.

86. **Official Capacity and *Monell*:** As with Count I, **Salt Lake County is liable** for the Fourteenth Amendment violations under *Monell*. The policy/custom of using fake subpoenas and detaining witnesses was an official policy attributable to the County (through its final policymakers), and/or the County showed deliberate indifference by not stopping it. Thus, the constitutional tort of violating substantive due process was committed by the County's agents pursuant to County policy. The County's liability on Count II is coextensive with its liability on Count I, since the same facts underlie both (merely invoking a different constitutional provision).

87. **Injury:** Plaintiff and class members suffered injuries to their dignity and fundamental rights as a result of Defendants' due process violations. The **shock, stress, and humiliation** of being tricked, searched, and detained by one's own government in violation of law is a compensable injury under § 1983. Additionally, the **loss of time and liberty** without due process is itself a harm. These injuries overlap with those described in Count I, and Plaintiff seeks to recover for them to the extent not fully addressed by the Fourth Amendment claim.

38

88. **No Legitimate Objective / Not Narrowly Tailored:** In assessing substantive due process, the courts sometimes ask if the government's action had a legitimate objective and if it used means that are not excessive. Here, even if Defendants' underlying goal (investigating crime or securing witness testimony) was legitimate, the means they chose were **grossly excessive and illegitimate**. There were obvious, specific, longstanding, lawful alternatives. The choice to use deception and detention instead points to an arbitrary exercise of power, not a reasoned pursuit of justice. This further underlines the substantive due process violation.

89. **Clearly Established and Shocks the Conscience:** It was clearly established, well before these events, that **falsifying legal process or abusing government authority to search and detain someone without due process is unconstitutional**. Any reasonable official would understand that **manufacturing a fake subpoena and searching and jailing someone (even temporarily) on that basis is a fundamental violation** of that person's rights. This is the kind of conduct one would expect the **Constitution unequivocally forbids**. Defendants' conduct, as alleged, **shocks the conscience** of a civilized society and thus squarely falls within the ambit of substantive due process protection.

90. **Relief Sought:** Plaintiff and the class seek **declaratory judgment** that Defendants' actions violated their substantive due process rights, and a **permanent injunction** preventing Defendants from issuing unauthorized subpoenas or otherwise engaging in the practice of coercive detention without due process. Additionally, Plaintiff seeks **compensatory damages** for the class for the violation of their Fourteenth Amendment rights (to the extent distinct from the Fourth Amendment damages). Given the malicious or reckless nature of Defendants' conduct, **punitive damages** against the individual Defendants (DA Gill and CDDA Hall) are warranted on this claim as well. Attorneys' fees and further relief are also sought as detailed below.

**Count III – Municipal Liability (*Monell* Claim) – Unconstitutional Policy/Practice/Custom**
(Against Salt Lake County, and Against DA Gill and CDDA Hall in Their Official Capacities)

85. **Policy or Custom:** The unconstitutional acts described in Counts I and II were not isolated incidents, but rather the result of a **policy, practice, or custom officially adopted or maintained by Salt Lake County** through the Salt Lake County District Attorney's Office. Specifically, the **practice of issuing DA subpoenas without judicial authority and searching and detaining witnesses thereby** was a persistent and widespread practice, such that **Salt Lake County's policymakers knew or should have known of it** and that it represented the standard operating procedure of the DA's Office.

86. **Policymaker Involvement: DA Gill, as the elected District Attorney, and CDDA Hall, as Chief Deputy District Attorney leading the criminal division, were final policymakers for Salt Lake County** in the area of investigating and prosecuting crimes, including the methods by which witnesses are summoned and interviewed. Their actions and directives carry the force of official County policy. **DA Gill and CDDA Hall personally participated in, directed, or ratified the unconstitutional scheme**. That is, they either explicitly instructed deputies to use the "DA Subpoena" scheme – specifically in DA Gill's name under his explicit title and authority as "District Attorney for Salt Lake County" – and, once aware of its illegality, allowed it to continue without reprimand. Therefore, DA Gill's and CDDA Hall's involvement transforms the misconduct into **County policy** under *Monell*.

87. **Deliberate Indifference in Supervision/Training:** In the alternative or additionally, Salt Lake County (through DA Gill, CDDA Hall, or other supervisors in the DA's Office) **failed to train or supervise** its prosecutors and staff regarding the proper legal process for subpoenaing witnesses and the constitutional limits on searching and detaining individuals. This failure was **so reckless and inadequate** that it reflects a deliberate indifference to the rights of those who

would be affected (i.e., witnesses and others called in by the office). Given that the need for training on basic subpoena procedures and respecting constitutional rights is obvious, the lack of such training (evidenced by the ongoing misuse of subpoenas) was a moving force behind the violations. Had the County adequately trained its deputy DAs and other staffers that **they cannot lawfully compel witnesses through fraudulent and extortionate threats to be searched and detained for out-of-court *ex parte* interviews**, or had it supervised and caught this practice early, Ms. Bills and class members would not have been harmed. Thus, the County is liable for its **deliberate indifference to the need for training and supervision**.

88. ***Monell* Causation:** The policy/custom of using fraudulent subpoenas to search and detain witnesses was the **direct cause** (moving force) of the constitutional violations suffered by Plaintiff and the class. But for this policy, the violations would not have occurred. Each of the constitutional claims (Fourth Amendment and Fourteenth Amendment) can be traced back to this policy. That is, the Fourth Amendment violations occurred because the County's policy was to seize people via subpoenas not authorized by law, and issued in violation of the laws authorizing subpoenas to witnesses; the due process violations occurred because the County's policy eschewed any authorized judicial process.

89. **County and Official-Capacity Liability:** Accordingly, Salt Lake County is liable under 42 U.S.C. § 1983 for the constitutional violations committed by its officials pursuant to its policy/custom. Likewise, DA Gill and CDDA Hall, in their **official capacities**, are liable (this is essentially another way of pleading the claim against the County or the DA's Office as an entity). **Injunctive relief** in particular will run against the official capacity defendants and the County, requiring them to change their policy.

90. **Relief Sought:** Under this *Monell* claim, Plaintiff and the class seek to hold Salt Lake County and the official-capacity Defendants **responsible for the constitutional deprivations**. The relief sought includes: an **order declaring that the policy or custom in question is unconstitutional**; a **permanent injunction** prohibiting Salt Lake County (including the DA's Office) from continuing or resurrecting the practice; and an award of **damages against the County** for class members who were injured by the policy (excluding punitive damages, which are not available against the municipality). Salt Lake County's liability ensures that Plaintiff and the class can obtain full relief for past wrongs and secure structural change for the future.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Tamera Bills, on behalf of herself and the putative class, prays that the Court grant the following relief:

1. **Declaratory Judgment:** A declaration pursuant to 28 U.S.C. § 2201 that Defendants' actions and practices as described herein **violate the Fourth and Fourteenth Amendments**. Specifically, a declaration that the use of unauthorized "DA Subpoenas" to compel individuals to appear and the search detention of individuals pursuant to such subpoenas are unconstitutional.

2. **Injunctive Relief:** A permanent **injunction** prohibiting Defendants, their offices, agents, employees, and successors from issuing any subpoena or subpoena-like document **that does not comply with Utah Code and the Utah Rules of Criminal Procedure** to compel attendance of any witness or person at the DA's Office, and from searching or detaining any individual under color of a subpoena absent legal foundation. The injunction should further require Defendants to **institute policies, training, and supervision** within the Salt Lake County District Attorney's Office to ensure compliance

with constitutional requirements for summoning and interviewing witnesses (for example, training that all subpoenas issued by the DA's Office must command appearance before a court, magistrate or grand jury only if not otherwise authorized by a court through proper application). This relief is sought on a class-wide basis under Rule 23(b)(2), so that all class members (including future individuals) are protected.

3. **Compensatory/Liquidated/Nominal Damages:** An award of **compensatory damages** to Plaintiff and class members to compensate them for the injuries suffered as a result of Defendants' unconstitutional conduct. This includes payment for **loss of liberty, emotional distress, humiliation, inconvenience, incidental expenses, and any other actual damages** proven at trial for each individual who was subjected to the unlawful subpoena and detention practice. In the alternative, or to the extent full compensatory damages for each class member are not feasible in a class action, Plaintiff seeks equitable **liquidated damages** to be determined by expert testimony or some other equitable formula, or at least **nominal damages** for each class member to vindicate the violation of their rights.

4. **Punitive Damages:** An award of **punitive damages** against the individual Defendants **DA Gill and CDDA Hall** in their personal capacities. Punitive damages are justified because Defendants' actions were taken **maliciously, with evil intent, or with callous indifference** to the clearly established constitutional rights of Plaintiff and others. Punitive damages are necessary to **punish** these Defendants for their misconduct and to **deter** similar abuses of power by them or other officials in the future. *(Plaintiff does not seek punitive damages against Salt Lake County, as such damages are not available against a municipal entity under federal law.)*

5. **Attorneys' Fees and Costs:** An award of **reasonable attorneys' fees and litigation costs** pursuant to 42 U.S.C. § 1988 and any other applicable law, to compensate Plaintiff's counsel for the work done in vindicating these civil rights claims, as well as reimbursement of any expenses and costs incurred in this action.

6. **Pre- and Post-Judgment Interest:** An award of **pre-judgment and post-judgment interest** on all monetary sums awarded, at the highest rate allowed by law, from the date of injury or entitlement until the date of payment, to fully compensate Plaintiff and class members.

7. **Such Other Relief as the Court Deems Just and Proper:** Any further relief that the Court deems appropriate, just, or equitable, including but not limited to any necessary or appropriate **class-wide remedial measures** or oversight to ensure Defendants' compliance with the Court's judgment.

## JURY DEMAND

Plaintiff, on behalf of herself and the class, hereby **demands a trial by jury** on all issues so triable, including issues of liability and damages.

DATED this 5th day of May, 2025,

 /s/ R. Shane Johnson
R. Shane Johnson
*Attorney for Plaintiff*